`IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| BENJAMIN WALBORN, etc., et al., | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | ) CIVIL ACTION 25-0531-WS-N |
| | ) |
| ORANGE BEACH CITY BOARD OF | ) |
| EDUCATION, et al., | ) |
| | ) |
| **Defendants.** | ) |

## ORDER

This matter is before the Court on the entity defendants' motion to dismiss. (Doc. 11). The parties have filed briefs in support of their respective positions, (Docs. 11, 14, 15), and the motion is ripe for resolution. After careful consideration, the Court concludes that the motion is due to be granted in part and denied in part.

## BACKGROUND

The operative pleading is the first amended complaint ("the Complaint"). (Doc. 8). The two named plaintiffs ("Ben" and "Melissa") are the parents of two minor children ("B.W." and "I.W."). Ben and Melissa sue both individually and as the parents and guardians of B.W. and I.W. The defendants are the Orange Beach City Board of Education ("the Board"); the Orange Beach City School District ("the District"); the superintendent of Orange Beach City Schools ("Wilkes"); and the principal of Orange Beach Elementary School ("Law"). The individual defendants are sued in both their individual and official capacities.[1]

---

[1] The Complaint purports to name fictitious defendants, but such practice generally is not recognized in actions, such as this one, originally brought in federal court. *Richardson v. Johnson*, 598 F.3d 734, 738 (11th Cir. 2010). There is a limited exception to this rule, *id.*, but the Complaint's vague description of the fictitious defendants simply as those "responsible in

According to the Complaint, the Walborns live in Escambia County, Florida, but B.W. and I.W. were enrolled as non-resident students in Orange Beach City Schools (presumably, Orange Beach Elementary School) pursuant to Board policy.  In July 2024, B.W. participated in a private text message group with six other students, during which several of them made hostile, aggressive, and bullying remarks toward B.W.  When the Walborns contacted the parents of these students about the matter, they accused Ben of having authored the subject messages, which was not true.  On July 30, Ben reported the bullying to Wilkes and requested that B.W. be placed in a homeroom separate from these students.  Two days later, and without further discussion or contact, Wilkes issued a letter revoking the enrollment of both B.W. and I.W., effective immediately.  The expulsion letter falsely accused B.W. of hostile participation in the chat.  (Doc. 8 at 4-6).

The Complaint asserts the following claims:

- Count One          violation of the Due Process Clause
- Count Two          retaliation in violation of the First Amendment
- Count Three        breach of contract
- Count Four         negligence
- Count Five         intentional infliction of emotional distress
- Count Six          tortious interference with contractual relations
- Count Seven        arbitrary and capricious decision-making
- Count Eight        violation of the Equal Protection Clause
- Count Nine         defamation
- Count Ten          injunctive and declaratory relief

(Doc. 8 at 8-27).  Most of the claims are asserted against "all defendants."  However, Count Three is asserted against only the entity defendants, and Count Nine is asserted against only Wilkes.  (*Id*. at 13, 25).  The entity defendants seek dismissal with prejudice of all claims asserted against them.  (Doc. 11 at 2, 37).

---

some manner for the events and wrongful actions described herein," (Doc. 8, ¶ 11), plainly does not satisfy it.

## DISCUSSION

The movants, in their statement of the "legal standard of review," recite the principles of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and its progeny. (Doc. 8 at 4-5).  Those standards apply in all cases but, as the Court has recently reminded litigants, "*Twombly*" is not a thaumaturgical word, and its mere incantation by a defendant furnishes no grounds for relief.  *Caldwell v. Kimberly-Clark USA, LLC*, 783 F. Supp. 3d 1367, 1383 (S.D. Ala. 2024).  Instead, a defendant must "mak[e] a satisfactory showing that, in certain, specified respects, for certain, specified reasons, the complaint falls short of that [*Twombly*] standard."  *Id*.

### I.  Proper Defendant.

The movants argue that only the Board is a proper defendant, because state law vests the Board with all powers necessary or proper to administer and manage city schools and because the District "is not a separate legal entity apart from the Board" but is instead "synonymous" with the Board.  (Doc. 11 at 5-6).  The movants rely on three cases, two of which simply clarified the correct name of the school board, and the third of which ruled only that a particular school campus was not an entity separate from the school board.  (*Id*. at 6 n.4).  None of the movants' cases address either the suability or the redundancy of a school *district* as a defendant.  As plausible as the movants' position may be, they have not supported it with relevant authority or legal reasoning, and the Court will search for none on their behalf.

### II.  Official Capacity Claims.

As noted, Wilkes and Law are sued in both their individual and official capacities. The movants argue that the official-capacity claims should be dismissed as functionally equivalent to a direct lawsuit against the governmental entity.  (Doc. 11 at 6 n.5).  The movants' authorities are, and thus their motion is, restricted to federal claims.  The plaintiffs seek prospective declaratory and injunctive relief under each of their three

federal claims,[2] the granting of which may require the pendency of an official-capacity claim.[3]  The Court cannot on the movants' limited presentation approve the dismissal of these claims.

### III.  Sovereign Immunity.

Pursuant to its Constitution, "the State of Alabama shall never be made a defendant in any court of law or equity."  Ala. Const. § 14.  Section 14 "affords absolute immunity to both the State and State agencies."  *Ex parte Board of Trustees*, 411 So. 3d 1228, 1232 (Ala. 2024) (internal quotes omitted).  "Like county school boards, ... city boards of education ... are agencies of the state."  *City of Helena v. Pelham Board of Education*, 410 So. 3d 493, 504 (Ala. 2024) (internal quotes omitted).  "[T]herefore, they enjoy constitutional immunity" under Section 14.  *Ex parte Phenix City Board of Education*, 67 So. 3d 56, 60 (Ala. 2011).  The Alabama Supreme Court refers to this constitutional immunity as "sovereign immunity."  *E.g., Ex parte Alabama Department of Youth Services*, 401 So. 3d 276, 282-83 (Ala. 2024).  The movants assert that the general rule of sovereign immunity compels dismissal of all state-law claims against them.  (Doc. 11 at 7-9).

The plaintiffs respond that the general rule is riddled with exceptions, some of which are implicated by the Complaint.  (Doc. 14 at 5-6).  As the movants point out, (Doc. 15 at 5-6), none of the recognized exceptions permit an award of damages against either a state agency or a state official in his or her official capacity.  *E.g., Ex parte Riche*, 2025 WL 2679931 at *3 (Ala. 2025).  All demands for damages under the state-law

---

[2] (Doc. 8 at 13, 15, 25, 27-28).  The movants argue that Count Ten, for declaratory and injunctive relief, including prospective, seeks only a remedy, (Doc. 11 at 35), which presumably infuses the preceding federal counts.  (Doc. 8 at 27 (incorporating by reference all previous paragraphs)).

[3] *See, e.g., Benning v. Commissioner*, 71 F.4th 1324, 1335-36 (11th Cir. 2023).

claims are therefore due to be dismissed to the extent pressed against the Board and/or the individual defendants in their official capacities vis-a-vís the Board.[4]

Several of the plaintiffs' state-law claims seek injunctive relief. The movants concede that multiple exceptions to sovereign immunity permit the pursuit of such relief, and they do not argue that the injunctive relief sought by the plaintiffs is barred by Section 14. (Doc. 15 at 6). Instead, they argue that "Plaintiffs' injunctive relief claims are moot." (*Id*.). That is a separate argument, to be addressed in Part VIII.

Counts Four, Five, and Six do not seek any relief other than an award of damages. (Doc. 8 at 18-21). These claims therefore will be dismissed in their entirety as to the Board and the individual defendants in their official capacities vis-a-vís the Board.

## IV.   *Monell.*

Although the Board is a state agency for purposes of Section 14, the movants do not claim to possess Eleventh Amendment immunity.[5] Instead, they argue that the Complaint fails to allege a basis for entity liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). (Doc. 11 at 27-35).

Under *Monell*, the entity can be liable under Section 1983 in three situations: (1) "when execution of a government's ... policy inflicts the injury"; (2) "when the execution of a government's ... custom" does so; and (3) "when a municipal official with final policy-making authority in the area of the act or decision makes the challenged act or decision." *Smothers v. Childers*, 159 F.4th 922, 930-31 (11th Cir. 2025) (internal quotes omitted).

---

[4] Because, as discussed in Part I, the movants have not satisfactorily addressed the status of the District, the demands for damages under the state-law claims remain pending as to the District and the individual defendants in their official capacities vis-a-vís the District.

[5] *See generally Walker v. Jefferson County Board of Education*, 771 F.3d 748, 750 (11th Cir. 2014) (re-affirming that "school boards in Alabama [both county and city] are not arms of the state and therefore not entitled to Eleventh Amendment immunity").

The movants argue that the Complaint identifies no official government policy, adopted by the Board, that resulted in the alleged constitutional violations of the Due Process Clause, the Equal Protection Clause, and the First Amendment.  (Doc. 11 at 28-29).  The Court agrees.

The movants next argue that the Complaint fails to "identify or allege" a custom or practice "so pervasive and well-settled that it assumes the force of law."  (Doc. 11 at 30-31).  The movants do not acknowledge paragraph 54, which alleges "customs or practices" regarding "expulsion of non-resident students without investigation or hearing when complaints were made by influential parents within the community."  (Doc. 8 at 10).  Nor do the movants proffer any authority regarding the minimum requirements for *pleading* a custom or practice; all of their authorities concern the requisite *proof* to establish such a custom or practice.  Because the plaintiffs have alleged such a custom or practice, and because the movants have not demonstrated that the Complaint must contain additional or more detailed allegations, the Court cannot rule it deficient on this ground.

Next, the movants argue that the plaintiffs fail to identify an official imbued with final policymaking authority in the relevant area, *viz.*, enrollment/expulsion decisions.  (Doc. 11 at 31-34).  The Complaint alleges that Wilkes was the final decisionmaker regarding the students' expulsion, the final authority for the decision, and the final policymaker for student enrollment decisions, such as to constitute his decisions official policy for purposes of *Monell*.  (Doc. 8, ¶¶ 9, 49, 53, 55, 67).  The movants object that state law vests policymaking authority in the Board and limits a superintendent to executing Board policies, but the statutory provisions they cite do not say this.  Nor have the movants attempted to show that a policymaking body cannot delegate certain decisions to an employee so as to make him, at least potentially, a final policymaker as to such decisions.

The movants' primary argument is that "a municipal officer does not have final policymaking authority over a particular subject matter when that official's decisions are subject to meaningful administrative review."  *Scala v. City of Winter Park*, 116 F.3d

6

1396, 1401 (11th Cir. 1997).  According to the movants, Policies 5.33 and 5.33.1 of the Orange Beach City Schools Board Policy Manual ("the Manual"), (Doc. 8-1 at 116-18), provide for such review of expulsion decisions by Wilkes and therefore preclude him from constituting a final policymaker with respect to expulsions.[6]  The movants, however, offer no explication of these policies, and without one the Court is unable to conclude that they provide meaningful review of expulsion decisions by Wilkes.  For example, Section 5.33 by its terms addresses only procedures applicable "prior to" expulsion, not subsequent thereto, and Section 5.33.1 addresses only grievances by "students," not former students.

Finally, the movants assert without explanation that the plaintiffs fail to allege that the customs and policies identified above were the "moving force" behind any constitutional violations.  (Doc. 11 at 34-35).  The Court does not understand this objection.  With respect to custom, the Complaint alleges that there was a custom or practice of expelling non-resident students, without adherence to constitutional requirements, at the behest of well-connected residents, (Doc. 8, ¶ 54), and it alleges that B.W. and I.W. were expelled, in violation of constitutional guarantees, at the behest of well-connected residents.  (Doc. 8, ¶ 42).  This is at least an inferential allegation that they were expelled pursuant to the custom or practice, and an inferential allegation of an essential element is generally sufficient.  *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 960 (11th Cir. 2009).  With respect to policy, Wilkes' decision to expel B.W. and I.W., allegedly without providing due process, in retaliation for the exercise of free speech rights, and while shielding the other students from discipline, obviously was the moving force behind these asserted constitutional violations.

---

[6] Because the Manual is an exhibit to the Complaint, the Court may consider its contents without converting the instant motion into one for summary judgment.  *E.g., Miljkovic v. Shafritz and Drinkin, P.A.*, 791 F.3d 1291, 1297 n.4 (11th Cir. 2015).

## V.  Due Process.

The plaintiffs bring a claim for deprivation of property without procedural due process.  (Doc. 8 at 8-11).[7]  The movants argue that this claim fails because the plaintiffs have no protected property interest and because adequate post-deprivation remedies were available.  (Doc. 11 at 13-19).

"Property interests, of course, are not created by the Constitution.  Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits."  *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972).

The movants, relying on a 1962 decision of the Alabama Supreme Court, first argue that "there is neither a state nor federally created constitutional or statutory right to school in Alabama" and that this precludes the existence of a property interest in favor of the plaintiffs (or any Alabama citizen).  (Doc. 11 at 14-15).  In the next paragraph, however, the movants inconsistently declare that "Alabama - through its compulsory school attendance laws - has ... extended the right to a public education in Alabama to Alabama residents."  (*Id*. at 15 (emphasis omitted)).  Later, they again insist that "resident students are entitled to attend Orange Beach City Schools as a matter of right under Alabama law ...."  (*Id*. at 25 n.29).  Co-defendant Law, for her part, expressly concedes that "school age children who are Alabama residents are entitled to the procedural protections of the Due Process Clause ... for expulsion from an Alabama school."  (Doc. 23 at 20 (emphasis omitted)).  The Court cannot on this scant presentation conclude that Alabama citizens have no protected property interest in a public education.

The movants next argue that, even if Alabama law invests its citizens with a property right in a public education, it does not so invest citizens of Florida.  (Doc. 11 at 15).  The Court assumes for present purposes that this is correct, such that positive law

---

[7] In an abundance of caution, the movants address substantive due process, (Doc. 11 at 10-13), but the claim by its terms is confined to "procedural" due process.  (Doc. 8, ¶¶ 52, 55, 56).

8

does not bestow a property interest on the plaintiffs.  According to *Roth*, however, statutory law is only one potential source of property rights.  Other "sources" can provide "rules or understandings ... that support claims of entitlement" to certain benefits.  The plaintiffs assert that their property interest derives from their enrollment as non-residents, with payment of tuition, pursuant to a formal Board policy that permits revocation only for certain reasons.  (Doc. 14 at 7-8).

Policy 5.11 provides that a non-resident student "may be eligible to attend" a city school, and it provides a list of "factors" to be used in determining whether to grant such permission to a particular applicant.  (Doc. 8-1 at 93-94).  The policy extends to out-of-state students who meet the same guidelines, "when there is room available."  (*Id*. at 96).  Tuition and fees for out-of-state students exceed $8,000.  (*Id*.).  The movants argue that Policy 5.11 grants non-residents only a "privilege" to be bestowed at the "discretio[n]" of the school system, not an "entitlement" to attend city schools.  (Doc. 11 at 16-17).  This appears to be correct, but it is beside the point.  The defendants have already exercised their discretion in favor of enrolling B.W. and I.W.  The question is not whether the students had a property right in obtaining enrollment in the first place but whether, once enrolled, they had a property right in continued enrollment.

The movants argue that the plaintiffs had no such right because Policy 5.11 provides a list of reasons for which their enrollment could be revoked; this listing, they say, shows that the plaintiffs enjoyed only a "discretionary ... benefit."  (Doc. 11 at 17).  The key point, however, is not that the plaintiffs could be expelled but that Policy 5.11 limits the reasons for which they could be expelled.  Those reasons are:  inappropriate behavior or poor disciplinary record; excessive tardiness or absence; unsatisfactory academic performance; falsification of school or legal documents; late payment of tuition; attempted circumvention of school/school system policies and procedures; and "[a]ny other good and sufficient reason."  (Doc. 8-1 at 94).  The plaintiffs, it seems, could not be expelled on administrative whim.  Their situation thus would seem comparable to that of public employees subject to termination only for cause:  "When a public employee is in a position where they can only be discharged for cause, the public employee has a

9

constitutionally protected property interest in their employment and cannot be fired without due process." *Edwards v. Dothan City Schools*, 82 F.4th 1306, 1310 (11th Cir. 2023).

Without acknowledging the foregoing principle, the movants offer *Stough v. Gallagher*, 967 F.2d 1523 (11th Cir. 1992), for the proposition that "[i]nternal policy provisions -- such as those contained in a board's policy manual -- are insufficient to create such an entitlement absent an independent source of state law." (Doc. 11 at 16). The Court does not understand *Stough* to stretch so far. The plaintiff in *Stough* was a deputy sheriff who challenged his demotion from captain to sergeant. 967 F.2d at 1524. Under Georgia law, deputy sheriffs are not employees at all, their selection and retention is under the absolute control of the sheriff, and Georgia courts have declared they have no property interest in their positions. *Id*. at 1530. In that unique context, an internal career service policy and procedure manual promulgated by the defendant's predecessor, which purported to preclude demotion absent specified cause, could not override state law so as to give the plaintiff a property interest in the rank of captain. *Id*. at 1524, 1530. Unlike in *Stough*, the movants have not shown that state law affirmatively precludes the creation of a property interest by administrative policy.

The movants find it "[c]ritica[l]" that the Manual disclaims the creation of any property interest in employment. (Doc. 11 at 17 n.19). The Manual, however, does not similarly disclaim the creation of any property interest in continued enrollment, which if anything argues against the movants' position.

Finally, the movants argue as a universal proposition that there can be no property interest in attending a particular school. (Doc. 11 at 15 n.17). They cite no case from the Eleventh Circuit and no case involving an out-of-state student (who presumably has but one in-state option) already enrolled and subject to expulsion only for specified reasons, and the Court will not fill in the gaps in the movants' cursory presentation.

Turning to the existence of adequate post-deprivation remedies, the movants posit that Policies 5.33 and 5.33.1 provide them. (Doc. 11 at 18-19). For reasons already expressed, the Court cannot on this slim record agree. As noted in Part IV, Policy 5.33

by its terms provides only for procedures to be followed "prior to dismissal," not following dismissal. (Doc. 8-1 at 116). Policy 5.33.1 confines its scope to the complaints of "students," not former students, and its procedures -- which begin with two levels involving the school principal, (*id*. at 116-18) -- do not obviously suggest their applicability to expulsion decisions already made by the superintendent.

With similar lack of explanation, the movants present Ala. Code § 12-15-115(b)(2) as presenting an independently adequate post-deprivation remedy. (Doc. 11 at 19). Under this provision, "[a] juvenile court also shall have original jurisdiction in proceedings concerning any child ... [w]here it is alleged that the rights of a child are improperly denied or infringed in proceedings resulting in suspension, expulsion or exclusion from a public school." While this provision may offer an adequate post-deprivation remedy, the movants do not address what is required to constitute such a remedy or how the provision meets those requirements, and the Court will not perform this work on the movants' behalf.

## VI. First Amendment.

The Complaint alleges that the defendants retaliated against the plaintiffs for engaging in protected speech. (Doc. 8 at 11-13). In particular, it alleges that the plaintiffs (presumably, Ben) engaged in protected speech by: reporting concerns of bullying involving B.W.; requesting that B.W. be placed in a different homeroom from the harassers; and raising concerns about how the Board was handling the situation. (*Id*., ¶ 64).

The movants principally argue that the plaintiffs did not engage in constitutionally protected speech because that speech did not involve matters of public concern. (Doc. 11 at 20-22). They are able to muster only thin support for their position, consisting of *ipse dixits* from a few district court cases and a single Seventh Circuit opinion that has been soundly criticized by the Sixth Circuit. To their credit, the movants also cite several cases rejecting a public-concern requirement in the public school context. The movants acknowledge that the Eleventh Circuit has not resolved the issue, but they encourage the

11

Court to predict that it would adopt the Seventh Circuit's view, offering no reason to believe the Eleventh Circuit would do so other than that such a result would be advantageous to them.  On the limited argument presented, the Court declines the movants' invitation.

The movants' only other argument is a stripped-down repetition of its *Monell* argument, (Doc. 11 at 22-23), which fails for reasons given in Part IV.[8]

## VII.  Equal Protection.

The Complaint asserts a class-of-one equal protection claim.  (Doc. 8 at 23-25).  It alleges that, in the private texts precipitating this lawsuit, several students made hostile and aggressive remarks towards B.W. but that B.W. was expelled for hostile participation in the chat while the other students were not.  (*Id*., ¶¶ 20, 28, 111).  The movants argue that the other students, as a matter of law, cannot be similarly situated to B.W. for purposes of an equal protection claim because B.W. was a non-resident student admitted under Policy 5.11 and the Complaint fails to allege that the other students were also non-residents rather than residents of Orange Beach.  (Doc. 11 at 23-26).

Because the plaintiffs do not claim membership in any class or group, they proceed on a "class of one" theory, in which "the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).  "To be similarly situated [for purposes of class-of-one analysis], the comparators must be prima facie identical in all relevant respects."  *Grider v. City of Auburn*, 618 F.3d 1240, 1264 (11th Cir. 2010) (emphasis and internal quotes omitted).  "A plaintiff must ultimately show that it and any comparators are similarly situated in

---

[8] In its reply brief, the movants without explanation attempt to inject a new argument regarding a different element of a First Amendment claim.  (Doc. 15 at 11).  The argument is too skeletal to be evaluated but, in any event, the Court will consider a non-jurisdictional argument first raised in a reply brief only if "the offending party articulates an adequate reason for its failure to present in its principal brief an argument then available to it."  *Caldwell*, 783 F. Supp. 3d at 1377 (internal quotes omitted).

light of all the factors that would be relevant to an objectively reasonable government decisionmaker." *PBT Real Estate, LLC v. Town of Palm Beach*, 988 F.3d 1274, 1285 (11th Cir. 2021) (internal quotes omitted).

The movants assume rather than demonstrate that the residence of the involved students would be relevant to an objectively reasonable school official in determining the punishment for engaging in hostile text messages. The Court does not see how this could be so. Expulsion is an available penalty for "*any* student who has committed a serious breach of conduct according to the Code of Student Conduct," (Doc. 8-1 at 116 (emphasis added)), residents as well as non-residents. What the movants propose is that an objectively reasonable superintendent is entitled to expel some students and exonerate others engaged in the same conduct simply because the disfavored students live outside the school district. It may be a natural human tendency to favor locals and disfavor non-locals, but the movants offer no authority for the jarring suggestion that residence is a legitimate factor that an objectively reasonable superintendent can properly consider -- indeed, consider dispositive -- in meting out discipline.[9]

The movants appear to suggest that the Complaint is defective because, although it identifies the comparators as the other students involved in the text messaging, it does not list them by name. (Doc. 11 at 24, 25 n.29). The movants cite no rule or precedent requiring such specificity when the identity of the comparators is perfectly known to them.

Finally, the movants argue that, even if the resident students involved in the text messaging are similarly situated to B.W., the difference in residency status provides the necessary "rational basis" for the difference in their treatment. (Doc. 11 at 26). Again,

---

[9] The movants believe that residency matters because, while resident students are entitled to attend city schools "as a matter of right under Alabama law," non-residents may attend only at the superintendent's discretion under Policy 5.11. (Doc. 11 at 25 n.29). While this distinction could support consideration of residence status in making initial enrollment decisions, it does not obviously support such consideration in making disciplinary decisions regarding enrolled students.

13

the movants provide no authority for their position, which suffers from the same defects addressed above.[10]

## VIII. Injunctive and Declaratory Relief.

Most claims asserted in the Complaint include demands for declaratory and injunctive relief. Count Ten seeks such relief, "to reverse expulsion and prevent future retaliation." (Doc. 8 at 27-30). The movants argue that all demands for such relief should be dismissed as moot, on the grounds that, "upon information and belief," the plaintiffs have "relocated from the area," such that reinstatement is not a practical remedy. (Doc. 11 at 35-36). Even if the Court on motion to dismiss were permitted to consider evidentiary material outside the pleadings, it cannot consider a non-evidentiary assertion in a brief expressed only as the author's belief.

The movants note that the Complaint itself alleges that B.W. enrolled elsewhere and that I.W. is being homeschooled, which they say negates any threat of real or immediate injury necessary to support prospective injunctive relief. (Doc. 11 at 35). Except that a continuing desire to return to Orange Beach schools is not negated by the necessity of making other educational arrangements in the interim, any more than a terminated employee's obtaining of other work after being unlawfully discharged defeats her demand for reinstatement to her former position.

Finally, the movants fail to address the additional forms of declaratory and injunctive relief sought by the Complaint.

## IX. Punitive Damages.

The Complaint demands punitive damages as a remedy under all three federal claims and several of the state claims. The movants seek dismissal of all demands for punitive damages. (Doc. 11 at 36-37).

---

[10] The movants' repetitious *Monell* argument, (Doc. 11 at 26-27), likewise fails for reasons previously given.

"[W]e hold that a municipality is immune from punitive damages under 42 U.S.C. § 1983." *City of Newport v. Fact Concerts, Inc*., 453 U.S. 247, 271 (1981). This rule extends to "governmental agencies." *Geter v. Wilie*, 846 F.2d 1352, 1355 n.3 (11th Cir. 1988). "Punitive damages may not be awarded against the State of Alabama or any county or municipality thereof, or any agency thereof ...." Ala. Code § 6-11-26. As noted in Part III, the Board is a state agency for purposes of sovereign immunity. The plaintiffs do not contest the dismissal of their demands for punitive damages from the Board.[11]

## CONCLUSION

For the reasons set forth above, the motion to dismiss is **granted** as to the Board with respect to punitive damages under all claims and with respect to all damages under the state-law claims; and is **granted** as to Wilkes and Law in their official capacities vis-a-vís the Board with respect to all damages under the state-law claims. These claims for damages are **dismissed with prejudice**. Counts Four, Five, and Six are **dismissed with prejudice** as to the Board and as to Wilkes and Law in their official capacities vis-a-vís the Board. The motion to dismiss is in all other respects **denied**.

DONE and ORDERED this 11th day of June, 2026.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

[11] Because, as addressed in Part I, the status of the District remains undetermined, the demands for punitive damages from the District remain intact. Because the movants do not address punitive damages awards under the federal claims against officials sued in their official capacities, those claims also remain intact.

15